UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

**Vernon H. DAHL, III**                                                          **PLAINTIFF**

**v.**                                                          **CIVIL ACTION NO. 3:18-CV-501-CRS**

**Jermaine KILGORE,** *et al.*                                                  **DEFENDANTS**

## MEMORANDUM OPINION

**I.      Introduction**

This lawsuit, originally filed by Plaintiff Vernon H. Dahl, III in the Jefferson County Circuit Court, claims that Defendants Jermaine Kilgore, Nicholas Lietz, and Cher Fillmore conspired to violate Dahl's constitutional rights and commit various torts against him. Lietz removed the case to this Court. Once here, Kilgore moved to dismiss the claims against him, arguing that (A) he is immune from suit based on sovereign, governmental, and qualified immunity, (B) Dahl fails to state a claim on which relief may be granted, and (C) Dahl did not properly serve process in the state court. Dahl has not responded. Therefore, this matter is ripe for review. For the following reasons, the Court will grant the motion to dismiss in part and deny the motion to dismiss in part.[1]

**II.     Factual Background[2]**

Dahl and Fillmore were, at some point, engaged in a romantic relationship. DN 1-2 at 2. That relationship had gone through some rough spots—including a brief separation around

---

[1] Kilgore has also moved to supplement the record by including an audiotaped hearing conducted in the state court on July 30, 2018 before Judge McKay Chauvin. DNs 9, 10. In the interest of completeness, the motion will be granted and considered in ruling on the Rule 12(b)(6) motion. *Bassett v. National Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) ("When a court is presented with a Rule 12(b)(6) motion, it may consider . . . items appearing in the record of the case . . . .").

[2] Since this case is before the Court on a 12(b)(6) motion, the Court views the complaint in the light most favorable to the plaintiff and takes all well-pleaded factual allegations as true. *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (citations omitted).

January 2017. *Id*. at 4. On February 13, 2017, around 12:30 in the morning, Dahl made his way to Fillmore's apartment complex. *Id*. at 2. After he arrived and parked his car, he sat for a few minutes playing games on his phone before exiting the car and walking around to the back of the building. *Id*. at 2-3. His plan was apparently to see whether the lights were on in Fillmore's apartment to determine if she was awake. *Id*. at 3. However, no light through yonder window broke and Dahl, abandoning any potential soliloquy, began to return to his car. *Id*.

In the parking lot, Dahl was approached by Kilgore, a Kentucky State Trooper dressed in plain clothes but wearing an officer's badge. *Id*. at 3. Dahl thought it might be the officer that he knew lived in the complex. *Id*. Without identifying himself, Kilgore asked Dahl what he was doing. *Id*. He explained that he was there visiting Fillmore and, upon request, provided his driver's license. *Id*. Kilgore then asked if Dahl had any weapons on him. *Id*. He replied that he did not. *Id*. Regardless, Kilgore searched Dahl without consent. *Id*. No weapons or contraband were discovered. *Id*.

Shortly thereafter, a marked Louisville Metro Police Department (LMPD) cruiser arrived driven by Defendant Nicholas Lietz, an officer with the LMPD. *Id*. at 4.[3] Kilgore gave Dahl's license to Lietz, who returned to his cruiser to perform a records check. *Id*. Lietz, finding no warrants or other adverse information, returned the driver's license to Dahl. *Id*. Kilgore then continued his questioning about Dahl's presence and relationship with Fillmore. *Id*. Specifically, he asked whether Dahl and Fillmore "had been having any 'issues,'" if Dahl came to Fillmore's apartment to see if she was "entertaining another person," and how long Dahl had been on the

---

[3] During the encounter, Lietz was wearing a body camera but had turned it off during the discussion in the parking lot. *Id*. at 7. *Id*. Dahl complained to LMPD following his encounter with Kilgore and Lietz. *Id.* Ultimately, LMPD found a violation of department protocol and placed an official letter of reprimand in Lietz's personnel file. *Id*. It is unclear whether the violation was based on the body camera or the apparent fact that Lietz was never dispatched to the apartment, but was instead summoned by a personal call from Kilgore. *Id*. at 8. The letter of reprimand was not included with the Complaint filed in this Court. Regardless, the information is irrelevant to the present issue of Kilgore's authority to detain and search Dahl.

2

property. *Id.*[4] Dahl replied that he had recently reconnected with Fillmore, that he had not come to spy on her, and that he had been there between 15 and 20 minutes. *Id.* Kilgore then told Dahl he had a witness who said Dahl had been on the premises for more than an hour. *Id.*

As the questioning continued, Kilgore became increasingly aggressive and agitated. *Id.* at 5. Dahl told Kilgore he thought it best that he call his attorney. *Id*. As he removed his cellphone from his pocket, Kilgore attempted to grab the cell phone before rushing toward Dahl. *Id*. Kilgore shoved Dahl backwards—jamming his thumb as a result—and took his cell phone. *Id*. Kilgore then searched through Dahl's cell phone, found Fillmore's phone number, and called her. *Id.* When she did not answer, Kilgore stormed up to her apartment and began pounding on the door. *Id*. Fillmore still did not respond. *Id*. Kilgore indicated he would try to reach Fillmore the following day and returned Dahl's cell phone. *Id*.

After the incident in the parking lot, Kilgore told Fillmore that Dahl had been stalking her and trying to look into her apartment window. *Id*. Kilgore then filed an Incident Report with the Kentucky State Police which Dahl claims "maliciously and intentionally misrepresented the events" that occurred that night. *Id*. Kilgore and/or Fillmore then told the management of Fillmore's complex that Dahl was a stalker. *Id*. This resulted in a certified letter from the management of the complex ordering Dahl to refrain from entering the premises. *Id*. at 7. Fillmore then went to the Jefferson County District Court where she received an Emergency Protective Order and, eventually, a Domestic Violence Order against Dahl. *Id*.

---

[4] Dahl seems to insinuate that Kilgore had some ulterior motive for the stop and frisk. *See Id*. at 5 ("Dahl thought it odd that, out of 100 cars in the parking lot, Kilgore seemed to know which one was Fillmore's."). However, an officer's motives are generally irrelevant if probable cause or reasonable suspicion exist. *Whren v. United States*, 517 U.S. 806, 812 (1996).

## III. Discussion

Kilgore argues that (A) he is immune from suit based on sovereign, governmental, and qualified immunity, (B) Dahl fails to state a claim on which relief may be granted, and (C) Dahl did not properly serve process in the state court. As a logical matter, the Court first considers the various immunity doctrines. That is primarily because these doctrines provide more than immunity from liability—they provide immunity from suit entirely. Ultimately, however, due to the procedural posture of this case, the Court finds that Rule 12(b)(6) is a more appropriate vehicle to resolve the issues at this juncture. Applying that framework, the Court finds that the complaint states a claim on which relief can be granted on all grounds except some aspects of the Fourth Amendment claim (Count II). Finally, the Court finds that Dahl attempted to serve Kilgore in good faith.

### A. The Immunity Doctrines

Different immunity doctrines apply to official capacity and individual capacity suits. Here, Dahl has not affirmatively pled whether he is suing Kilgore in his official or individual capacity. Therefore, the Court must first determine the capacity in which Kilgore was sued. If he is sued in his official capacity, he may claim the sovereign and governmental immunity of the Commonwealth of Kentucky. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (states and employees in their official capacities are not "persons" subject to § 1983); *Yanero v. Davis*, 65 S.W.3d 510, 519 (Ky. 2001) (immunity for officials undertaking governmental functions). On the other hand, only qualified immunity is available to him in his individual capacity.

### i. Capacity

Generally, plaintiffs seeking damages under § 1983 are required to set forth clearly in their pleadings that they are suing state officers as individuals, rather than officials. *Wells v. Brown*, 891 F.2d 591, 592 (6th Cir. 1989). This rests on two rationales: that defendants receive notice of potential individual liability and to ensure that plaintiffs are not suing states in violation of the Eleventh Amendment. *Id.* at 593–94. However, this is not a per se rule—instead, the Sixth Circuit has held that courts should apply a "course of proceedings" test to determine whether § 1983 defendants have received sufficient notice of the plaintiff's intent to seek personal liability. *Moore v. City of Harriman*, 272 F.3d 769, 772 (6th Cir. 2001) (en banc). This can be made clear in the complaint or in later pleadings. *Id.* In applying the course of proceedings test, the Court may consider "the nature of the plaintiff's claims, requests for compensatory or punitive damages, and the nature of any defenses raised in response to the complaint, particularly claims of qualified immunity, to determine whether the defendant had actual knowledge of the potential for individual liability." *Id.* at 772, n 1.

First, as to the nature of the claims, Kilgore is being sued on theories of defamation, false arrest, and assault/battery. DN 1-2 at 8–9. Such intentional tort claims tend to indicate that the claim was based on individual capacity. *See e.g. Rose v. Reed*, 2:12-CV-977, 2014 WL 3547375 at *4 (S.D. Ohio July 17, 2014) (individual capacity suit when the claim was based on alleged excessive use of force). Second, as to damages, Dahl seeks "actual, consequential, special, and punitive damages." DN 1-2 at 10. Such claims for damages tend to indicate an individual capacity suit, as monetary damages are generally unavailable from the state or official capacity defendants. *Shepherd v. Wellman*, 313 F.3d 963, 969 (6th Cir. 2002). Finally, as to the nature of defenses, Kilgore is quick to note that the complaint is unclear as to the capacity in which he is

being sued and makes arguments concerning both his official capacity (e.g. sovereign immunity) and individual capacity (e.g. qualified immunity). "The assertion of a qualified-immunity defense (even a contingent qualified-immunity defense) indicates that the defendants were aware they could be held personally liable." *Lindsay v. Bogle*, 92 F. App'x 165, 169 (6th Cir. 2004). Further, at the July 30, 2018 hearing in the state court, counsel for Kilgore represented that they were appearing on behalf of Kilgore in his official and individual capacities. DN 10 at 01:52–02:09. Taken together, it is clear that Kilgore was sued in his individual capacity and must rely on qualified immunity, rather than sovereign or governmental immunities.

### ii. Qualified Immunity

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "If *no* reasonably competent officer would have taken the same action, then qualified immunity should be denied; however, 'if officers of reasonable competence could disagree on [the legality of the action], immunity should be recognized.'" *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007) (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)) (alteration in original).

"Dismissals on the basis of qualified immunity are generally made pursuant [to] summary judgment motions, not 12(b)(6) sufficiency of pleadings motions." *Grose v. Caruso*, 284 F. App'x 279, 283 (6th Cir. 2008). Qualified immunity is a fact-intensive inquiry and is best resolved after discovery, when the record more clearly indicates that qualified immunity is proper. *Id.* "This court can resolve the qualified immunity inquiry based on a pre-answer motion to dismiss . . . only if it is clear that no violation of a clearly established constitutional right could

6

be found under any set of facts that could be proven consistent with the allegations or pleadings." *Jackson v. Schultz*, 429 F.3d 586, 589 (6th Cir. 2005) (citing *Cooper v. Parrish*, 203 F.3d 937, 944 (6th Cir. 2000)).

Put another way, "whether a particular complaint sufficiently alleges a clearly established violation of law cannot be decided in isolation from the facts pleaded." *Ashcroft v. Iqbal*, 556 U.S. 662, 673 (2009). As a result, "the standard for whether [a defendant] is entitled to qualified immunity essentially collapses into the standard for whether [a plaintiff] has sufficiently plead his claim for relief." *Jackson v. Jernigan*, 3:16-CV-750-JHM, 2017 WL 1962713, at *7 (W.D. Ky. May 11, 2017) (citing *Keating v. City of Miami*, 598 F.3d 753, 760 (11th Cir. 2010) ("At the motion to dismiss stage in the litigation, the qualified immunity inquiry and the Rule 12(b)(6) standard become intertwined") and *Morgan v. Swanson*, 659 F.3d 359, 384 (5th Cir. 2011) ("At the 12(b)(6) stage, to hold that the defendant violated the law at step one of the qualified-immunity analysis . . . is simply to say that the plaintiff has stated a claim upon which relief may be granted")). Therefore, rather than address qualified immunity separately, the Court addresses the issues under the 12(b)(6) framework. On a later motion for summary judgment, the Court may reconsider qualified immunity with a more developed record.

### B. Rule 12(b)(6): Failure to State a Claim

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The complaint need not contain "detailed factual allegations," yet must provide "more than an unadorned, the-defendant-

unlawfully-harmed-me accusation." *Id.* "Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *Eidson v. Tenn. Dept. of Child Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). In undertaking this inquiry, "a district court must (1) view the complaint in the light most favorable to the plaintiff and (2) take all well-pleaded factual allegations as true." *Tackett*, 561 F.3d at 488. "The defendant has the burden of showing that the plaintiff has failed to state a claim for relief[.]" *Wesley v. Campbell*, 779 F.3d 421, 428 (6th Cir. 2015).

### i. False Arrest and Illegal Detention (Count II)

Dahl's federal law claim amounts to a Fourth Amendment challenge to the alleged search and seizure conducted by Kilgore. DN 1-2 at 8. We interpret this as a claim brought pursuant to the federal civil rights statute, 42 U.S.C. § 1983. To state a Fourth Amendment claim under § 1983, a plaintiff must plead that they were searched or seized and that the intrusion was not justified by probable cause (in the case of arrests and searches) or reasonable suspicion (in the case of stops and frisks). *Voyticky v. Village of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005).

An officer may briefly stop a person to dispel the officer's reasonable suspicion that the person has committed, is committing, or is about to commit a crime. *Terry v. Ohio*, 392 U.S. 1, 28 (1968). The officer may also, with reasonable suspicion that the person is armed, frisk the person for weapons. *Id*. at 27. Such stop-and-frisk encounters must be both (1) "justified at its inception" by reasonable suspicion and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." *Id*. at 20. To demonstrate reasonable suspicion, the officer must be able to point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21. This inquiry is governed by an objective standard: "would the facts available to the officer at the moment of the

8

seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Id.* at 21–22.

This investigatory stop can, however, ripen into a full search or seizure that must be justified by probable cause. "There is no bright line that distinguishes an investigative detention from an arrest." *United States v. Lopez-Arias*, 344 F.3d 623, 628 (6th Cir. 2003) (citing *Florida v. Royer*, 460 U.S. 491, 506 (1983)). There are several factors the Court may consider in making that determination, including whether the suspect was transported from the scene of the initial encounter, *Dunaway v. New York*, 442 U.S. 200, 212 (1979), the length of the stop, *United States v. Sharpe*, 470 U.S. 675, 676 (1985), the use of force or physical restraint, the extent and nature of the questioning of the suspect, the location of the questioning, *Lopez-Arias*, 344 F.3d at 628, and the weather, *Burchett v. Kiefer*, 310 F.3d 937, 945 (6th Cir. 2002).

Dahl claims that his "detention, standing outside in frigid weather for an extended period of time, amounted to a *de facto* arrest, since he was led to believe that he could not leave and was obliged to cooperate with law enforcement officers." DN 1-2 at 8–9. It is clear that "unnecessary detention in extreme temperatures . . . violates the Fourth Amendment's prohibitions on unreasonable searches and seizures." *Burchett*, 310 F.3d at 945. However, a detention for a reasonable duration, even in such extreme temperatures, does not rise to the level of an arrest. *Id.* Dahl does not plead what the temperature was, whether there was precipitation, or how long the stop lasted. These are essential to the reasonableness inquiry. Therefore, on this point, the complaint is too vague to meet the plausible pleading requirements of *Twombly* and *Iqbal* and Kilgore's motion will be granted.

Dahl independently pleads that he was "searched" by Kilgore. DN 1-2 at 3, 5, 8. It is unclear whether Dahl is describing a "search" or a "frisk." A mere frisk would be

constitutionally permissible if Kilgore had reasonable suspicion that Dahl was armed. A search, on the other hand, would not be permissible unless Kilgore obtained a warrant or some exception applied. This vagueness warrants dismissal to the extent Dahl challenges the search of his person. However, Dahl has adequately pled that Kilgore searched his cell phone. The justifications underlying the search incident to arrest doctrine do not apply to a search of a cell phone, since there is no concern regarding the use of the phone as a weapon or destruction of evidence. *Riley v. California*, 134 S. Ct. 2473, 2485–87 (2014). The Court sees no reason *Riley*'s logic should not apply here, as a *Terry* frisk is supposed to be much less intrusive than an arrest and the same underlying justification—searching for weapons—justifies a *Terry* frisk.

Dahl has failed to plausibly plead that he was arrested or that his person was improperly searched. Therefore, to that extent Kilgore's motion to dismiss will be granted.[5] However, Dahl has plausibly pled that his phone was improperly searched. Therefore, to that extent, Kilgore's motion to dismiss will be denied.

### ii. Assault and Battery (Count III)

Dahl claims that the improper search and the taking of his phone by Kilgore are both actionable as assault and battery. Kilgore argues dismissal is proper because (1) Dahl has not properly pled an assault and (2) any alleged assault and battery is covered by the doctrine of qualified immunity. To the extent the claim focuses on the search of Dahl, the issue devolves to whether it was justified. Therefore, it is addressed as part of the Fourth Amendment inquiry *supra* at i. However, to the extent the claim focuses on the forceful seizure of the cell phone, assault and battery are available.

---

[5] This ruling applies to the federal constitutional claims as well as the Kentucky constitutional claims, since "Section 10 of the Kentucky Constitution provides no greater protection than does the federal Fourth Amendment." *LaFollette v. Commonwealth*, 915 S.W.2d 747, 748 (Ky. 1996) (citing *Estep v. Commonwealth*, 663 S.W.2d 213 (1983)).

"Assault is a tort which merely requires the threat of unwanted touching of the victim, while battery requires an actual unwanted touching." *Banks v. Fritsch*, 39 S.W.3d 474, 480 (Ky. App. 2001). These are two distinct and independent legal claims. *Ali v. City of Louisville*, 3:05-CV-427-R, 2006 WL 2663018 at *3 n. 7 (W.D. Ky. Sept. 15, 2006). As a result, an action for battery can lie without assault (if, for example, there was no threat perceived by the victim) and an action for assault can lie without battery (if, for example, there was a threat of physical contact which ultimately did not occur). It is true that Dahl focuses primarily on the unwanted physical contact. DN 1-2 at 9. However, he alleges that:

> When Dahl removed his cellphone from his pocket, Defendant Kilgore *attempted to snatch* the cellphone from Dahl's hand. Dahl *backed away*, holding on to his cellphone, and Kilgore *aggressively rushed toward him*, assaulting Dahl with his flashlight and forearm. Kilgore shoved Dahl backwards, and forced the cellphone into Dahl, jamming Dahl's thumb and forcing him to loosen his hold on the cellphone.

DN 1-2 at 5 (emphasis added). These facts, taken as true, would be sufficient to support the proposition that Kilgore threatened Dahl with unwanted physical contact and then followed through on the threat with an actual unwanted physical contact. Therefore, Kilgore's motion to dismiss on this point will be denied.

### iii. Defamation (Count I)

Dahl bases his defamation claim on Kilgore's incident report filed with the Kentucky State Police and on a discussion Kilgore and/or Fillmore had with the management of Fillmore's apartment community. Proving defamation in Kentucky requires: "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the

publication." *Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276, 282 (Ky. 2014). Kilgore's motion to dismiss argues only the he is entitled to an absolute privilege, protecting him from liability.

"It has long been settled Kentucky law that absolute immunity from defamation actions is available to certain governmental officials with respect to matters upon which the law requires them to act." *Compton v. Romans*, 869 S.W.2d 24, 26 (Ky. 1993). The Kentucky Court of Appeals eloquently explained the importance of, and policy underlying, the absolute privilege in such a factual scenario:

> It is true that the class of absolutely privileged communications are comparatively few, and that the courts have evinced a purpose not to extend that class, and yet, in sound reason and logic, it cannot be said it should not apply to *a public official upon whom there is imposed a specific duty by law to act in a given matter*. The imposing of such duty presumably authorizes him to act with perfect freedom and without fear of personal consequences. If in the discharge of a duty imposed by law a public official clothed with quasi judicial powers may have suspended over his head continually the threat of libel suits, it is apparent that his official conduct would be tempered by and tainted with the fear that he might be unjustly subjected to such actions. The policy of the law is therefore, and the reason of the rule is, that, although upon rare occasions judges and other public officials upon whom are imposed by law judicial or quasi judicial duties may maliciously slander or calumniate in the exercise of their authority, it is better that they should be protected upon such occasions by this absolute privilege than that the great body of such officials in the conscientious exercise of their duties should be hampered continually by the threat of such civil actions. Obviously one discharging such duties, except for such exemption, might perform them in a timid, time-serving, or inefficient manner. It is a rule therefore of public policy, not designed to protect the malicious official from the consequences of his wrongful act, but to protect the whole public from weak and vacillating public service by those upon whom such duties are imposed by law.

*McAlister & Co. v. Jenkins*, 284 S.W. 88, 90–91 (Ky. App. 1926) (emphasis added). However, despite *McAlister*'s otherwise sweeping language, it is of limited availability.

Put simply, absolute immunity is limited to "judicial and legislative proceedings, matters involving military affairs, and communications made in the discharge of a duty under express authority of law by or to heads of executive departments of the state." *Tanner v. Stevenson*, 128

S.W. 878, 881 (Ky. App. 1910). *Tanner*, another eloquent opinion by the Kentucky Court of Appeals, addresses the danger of broadly interpreting the absolute privilege against defamation:

> The cases to which this privilege applies are few in number and ought not to be enlarged. It would be a dangerous and vicious thing to license people to write and speak without any restraint. There are many evil–minded and recklessly disposed who would shelter if they could under the protection afforded by absolute privilege and give free bridle to tongue and pen to injure or destroy an enemy. It would place in the power of revengeful and unscrupulous persons the right to malign at will those who had incurred their displeasure, and allow the traducer to scatter without stint scandalous and defamatory matter about all who might come within the circle of his enmity.

*Id.*

The reconciliation of these examples of lofty dicta is presented by the Restatement and the majority of state courts. Put simply, an absolute privilege is available to federal officers and those limited classes of state officers described in *Tanner*. *See* RESTATEMENT (SECOND) OF TORTS § 591 (AM. L. INST. 2018). Other state officers are entitled to a conditional privilege. *See* RESTATEMENT (SECOND) OF TORTS § 598A (AM. L. INST. 2018). The conditional privilege is lost if (1) it is made with knowledge or reckless disregard as to the falsity of the defamatory matter, (2) it is published for some improper purpose, (3) there is excessive publication, (4) or there is publication not reasonably believed to be necessary to accomplish the purpose for which the occasion is privileged. *Toler*, 458 S.W.3d at 284. *See also* RESTATEMENT (SECOND) OF TORTS § 598A, cmt. a (AM. L. INST. 2018).

Kentucky law places a duty on state troopers to "collect, classify and maintain information useful for the detection of crime and the identification, apprehension and conviction of criminals." KY. REV. STAT. § 16.060. As a result, they are under an express duty to prepare their reports and are entitled to a qualified privilege for the statements contained in those reports. Therefore, for Dahl's complaint to survive a Rule 12(b)(6) motion, he must plausibly plead that the report falls within one of the four categories of unprivileged communications. Dahl does so

13

by alleging that the report "maliciously and intentionally misrepresented the events" of that night. DN 1-2 at 6. Specifically, Dahl alleges that the statement that he "was stalking his ex-girlfriend" was made with knowledge of falsity. *Id*. This is more than a conclusory allegation and provides sufficient specificity for Dahl's defamation claim to survive a motion to dismiss. *See* FED. R. CIV. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). Therefore, as to the incident report, Kilgore's motion will be denied.

As to the alleged statements to the apartment managers, the complaint sufficiently alleges that the statement about Dahl being a "stalker" was false and defamatory, the communication was published to a third party, fault amounting to intent, and harm caused a result. Therefore, the claim alleges each required element of defamation. Kilgore is not entitled to a qualified privilege for these statements because they were made outside of his official reporting and crime-prevention duties imposed by law. Therefore, as to the statements to the apartment managers, Kilgore's motion will be denied.

### iv. Punitive Damages (Count IV)

Punitive damages are available when a plaintiff proves, "by clear and convincing evidence, that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud, or malice." KY. REV. STAT. § 411.184(2). In making such a determination, the trier of fact considers: "(a) The likelihood at the relevant time that serious harm would arise from the defendant's misconduct; (b) The degree of the defendant's awareness of that likelihood; (c) The profitability of the misconduct to the defendant; (d) The duration of the misconduct and any concealment of it by the defendant; and (e) Any actions by the defendant to remedy the misconduct once it became known to the defendant." KY. REV. STAT. § 411.186(2). These claims are considered concurrently with all other issues presented. KY. REV. STAT. § 411.186(1).

Kilgore requests the Court find as a matter of law that Dahl is not entitled to punitive damages because (1) Kilgore did not engage in malicious or intentional conduct, (2) the actions were protected by immunity, (3) Kilgore does not allege physical injury, (4) Kilgore does not properly plead oppression, fraud, or malice, (5) such an award would violate Kilgore's Due Process rights under the federal and Kentucky constitutions, (6) such an award would violate the Excessive Fines Clause of the Eighth Amendment to the federal constitution, and (7) that any award for punitive damages must be bifurcated at trial. DN 11-1 at 22–23.

Some of these are factual questions to be resolved at a later date, some have already been found inapplicable by this Court, some are incorrect statements of law, and others can only be dealt with following a jury determination. Therefore, Kilgore's motion to dismiss on this point will be denied.

### C. Service of Process

In Kentucky, a "civil action is commenced by the filing of a complaint with the court and the issuance of a summons or warning order thereon in good faith." KY. R. CIV. P. 3.01. The "good faith" requirement requires "a contemporaneous intention on the part of the initiating party to diligently attend to the service of the summons." *Isaacs v. Caldwell*, 530 S.W.3d 449, 456 (Ky. 2017). The issuance of a summons creates a presumption that it was issued with a good faith intention to serve it. *Whittinghill v. Smith*, 562 S.W.2d 649, 649 (Ky. App. 1977). "In addressing a wide variety of challenges to deficiencies and inaccuracies in the issuance of summonses, [Kentucky] courts have routinely held that the defective summonses were nevertheless issued in 'good faith' and that they were thus sufficient to commence an action." *Arlinghaus Builders, Inc. v. Kentucky Pub. Serv. Comm'n*, 142 S.W.3d 693, 696 (Ky. App. 2003) (citing *Dep't of Highways v. Parker*, 394 S.W.2d 899 (Ky. 1965) (alias summons issued after

service on wrong officer sufficient for good faith); *Roehrig v. Merchs. and Businessmen's Mut. Ins. Co.*, 391 S.W.2d 369 (Ky. 1965) (inadvertent service of agent, rather than officer, still in good faith when remedied); *Hausman's Adm'r v. Poehlman*, 236 S.W.2d 259 (Ky. 1951) (mix-up in addresses); *Crowe v. Miller*, 467 S.W.2d 330 (Ky. 1971) (counsel mistake as to proper method of service on unmarried minor)).

The Jefferson County Circuit Court's docket sheet for *Dahl v. Kilgore*, 18-CI-900, indicates that the lawsuit was filed on February 12, 2018. Dahl attempted to serve Kilgore, Lietz, and Fillmore by certified mail on that same day. Service was successful on Fillmore but was not successful on Kilgore and Lietz, as that mail was returned undeliverable on March 30, 2018. Afterward, on June 19, 2018, Dahl attempted to serve Kilgore and Lietz through their respective law enforcement agencies. Kilgore was served on June 27, 2018 and Lietz was served on July 13, 2018. Dahl was consistently attempting to serve Defendants with process, ultimately succeeding within five months. These facts are insufficient to indicate that the presumption of good faith was vitiated. Therefore, Kilgore's motion to dismiss on this point will be denied.

## IV. Conclusion

Dahl has properly pled that Kilgore committed the state law torts of defamation, assault, and battery. He has further properly pled that the search of his cellphone was an improper search in violation of his Fourth Amendment rights. He has failed, however, to demonstrate that he was improperly searched or seized. Therefore, the Court will grant Kilgore's motion to dismiss to the extent Dahl alleges an improper search or seizure of his person but deny the motion in all other respects.

A separate order will be entered consistent with this opinion.

December 12, 2018

**Charles R. Simpson III, Senior Judge**
**United States District Court**

16