UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

VERNON H. DAHL, III                                        PLAINTIFF

vs.                                    CIVIL ACTION NO. 3:18-CV-00501-CRS

JERMAINE KILGORE, et al.                                   DEFENDANTS

## MEMORANDUM OPINION

This matter is before the Court on motions for summary judgment filed by Defendants
Nicholas Lietz ("Lietz"), Cher Fillmore ("Fillmore"), and Jermaine Kilgore ("Kilgore"). DN 43,
44, 46. Plaintiff, Vernon Dahl III ("Dahl"), responded to the motions filed by Kilgore and Fillmore.
DN 47, 48. Only Kilgore filed a reply. DN 49. The matter is now ripe for review. For the reasons
stated herein, the Court will grant in part and deny in part the motions for summary judgment.

## I. BACKGROUND

This action has its origin in an encounter between Dahl and Kilgore that occurred during
the night on February 12, 2017 or early-morning hours of February 13, 2017 at The Grove at
Lyndon, an apartment complex where Fillmore lived. DN 43-2 at 3-10. Dahl had driven there
that night to see whether the lights were on in Fillmore's apartment. DN 43-2 at 3. Dahl and
Fillmore were romantically involved at some point. DN 1-2 at 2. The status of their relationship
on February 12, 2017 is unclear from the record.

Kilgore, a Kentucky State Trooper, served as The Grove at Lyndon's part-time security
officer at that time and was acting in that capacity on the night of February 12-13. DN 46-1 at
14, 71. While surveying the area from his vehicle, Kilgore noticed Dahl's van in the parking lot.
DN 46-1 at 14-15. Kilgore had seen Dahl's van at the apartment complex on numerous occasions

and previously witnessed Dahl and Fillmore at the complex together, but noticed that on the night in question Dahl's van was parked "on a road behind . . . the court that he typically parks." DN 46-1 at 14-16, 64. Kilgore decided to drive past Dahl's van, but did not see Dahl sitting inside. DN 46-1 at 17.

Kilgore first noticed Dahl walking through the parking lot towards the maintenance shop. DN 46-1 at 18, 23. As Dahl approached the maintenance shop, he ventured onto the grass along near a row of trees, disappearing from Kilgore's sight. DN 46-1 at 18. Kilgore then exited his truck and started to walk towards the maintenance shop. DN 46-1 at 19. Dahl meanwhile had walked to the back of Fillmore's apartment, discovered that Fillmore's lights were off, assumed she was asleep, and began to return to his van. DN 43-2 at 3.

Kilgore saw Dahl reemerge in the breezeway between the apartment buildings. DN 46-1 at 19. Kilgore, dressed in caramel pants and a state police polo shirt, and equipped with an officer's badge and gun belt, approached Dahl to inquire about his behavior. DN 46-1 at 19-20. As the two drew closer, Kilgore asked Dahl "what he was doing behind the [apartment] building." DN 46-1 at 20. Dahl explained that he was there "checking on his girlfriend," Fillmore, and provided his driver's license to Kilgore. DN 46-1 at 24. Kilgore then asked if he could search Dahl for any weapons. DN 43-2 at 4. Upon Dahl's consent, Kilgore conducted a pat down of Dahl's person and did not discover any weapons or contraband. DN 46-1 at 24.

Around this time, Lietz, an officer with the Louisville Metro Police Department ("LMPD"), arrived in a marked LMPD cruiser. DN 46-1 at 24. Lietz drove through The Grove at Lyndon's parking lot periodically because the apartment complex was part of his beat. DN 46-3 at 8. As Lietz pulled up, he saw Kilgore and Dahl standing in the middle of the parking lot. DN 46-3 at 9. Believing that Kilgore was speaking with a friend, Lietz exited his vehicle to say hello.

DN 46-3 at 9. As Lietz walked closer, he overheard Kilgore questioning Dahl about why he was at the apartment complex and heard Dahl respond that he was there "to visit or check on his girlfriend." DN 46-3 at 9-10, 25. After reaching the men, Kilgore handed Dahl's driver's license to Lietz and asked him to run Dahl's information through the National Crime Information Center database. DN 46-3 at 10. The search returned no outstanding warrants or other adverse information, and Lietz returned Dahl's driver's license. DN 43-2 at 5.

There are differing versions of what occurred next. After additional questioning by Kilgore, Dahl contends that the following occurred:

> I took out my phone at that point and said, Matter [sic] of fact, I think it's time for me to get a hold of my attorney. And I had my phone in my right hand with just two fingers. And I was scrolling through with my left. And, um, at that point, I feel my phone being tugged. And I look up. And he's pulling my phone. So I pull back. And he basically lunges towards me with his other arm and pushes my phone back into my thumb, which jams my thumb back. And, urn [sic], I raised my arms up and let go of the phone. And he takes my phone.

DN 43-2 at 7.

Kilgore and Lietz testified that Dahl handed his phone to Kilgore to show him text messages Dahl had exchanged with Fillmore to corroborate Dahl's explanation about why he was on the premises. DN 46-1 at 26, DN 46-3 at 26.

The text messages contain the following correspondence[1]:

> Dahl: Just an FYI, I was going to ask you to dinner tonight because you're not available Tuesday.
> Fillmore: I'm not interested in Valentine's Day.
> Dahl: I don't think you are interested in much with me.
> Fillmore (9:13 pm): I've been really honest about where I'm at.
> Dahl (11:28 pm): Night
> Fillmore (11:32 pm): Night

---

[1] In Fillmore's deposition, she contends that she informed Dahl, on the night in question, via text message, not to come on the apartment's property again. DN 44-2 at 31. She has not provided copies of these messages.

DN 46-5. Kilgore asserts that he believed the messages contradicted Dahl's explanation that he was at the apartment complex at Fillmore's invitation because the messages appeared to him to suggest that "[Dahl] and [Fillmore were] in an argument" and that "she wanted to be left alone." DN 46-1 at 28, 54. Kilgore testified that he investigated further to "make sure [Fillmore and] her daughter were okay" because "Dahl acted [] suspicious in an uncommon area," "text messages [that] basically [said] leave [her] alone," and he was "unaware of [Dahl's] intentions or what [Dahl] was capable of." DN 46-1 at 44-48, 90-91. Lietz never saw these messages or handled Dahl's phone. DN 46-3 at 26-27.

Kilgore accessed Fillmore's phone number on Dahl's cell phone and placed a call to her. DN 46-1 at 26-27. Kilgore contends that Dahl became "agitated," so he "pushed [Dahl] with the side of [his] hand" that was holding a flashlight to create distance between them.[2] DN 46-1 at 87-89.

Next, Kilgore went to Fillmore's apartment and knocked on the door. DN 46-1 at 55, 46-3 at 35. Fillmore still did not respond. DN 44-2 at 10. Kilgore then went back to the parking lot and returned Dahl's phone to him. DN 46-1 at 34. Shortly thereafter, Dahl received a text message from Fillmore. DN 46-1 at 34. Kilgore testified that he "let Dahl go home" at this point because the text message "confirm[ed] that [Fillmore] was alive and [] could send texts." DN 46-1 at 47. Neither Kilgore nor Lietz issued Dahl a citation or placed Dahl under arrest. DN 46-1 at 44.

On the morning of February 13th, Kilgore went to Fillmore's apartment to inform her about Dahl's conduct the night before. DN 46-1 at 59, 97-99. Kilgore provided her with

---

[2] Lietz testified that he never saw Dahl try retrieve his phone. DN 46-3 at 38.

information concerning how to obtain an Interpersonal Protective Order ("IPO"). DN 44-2 at 26, 46-1 at 65.

On February 18, 2017, Fillmore went to the Jefferson County District Court Clerk's office where she obtained a temporary IPO against Dahl. DN at 46-2 at 43-49. Several weeks later, Jefferson County District Court Judge Annette Karem held a hearing at which both parties appeared—Dahl was represented by counsel—and were given the opportunity to present their version of events. DN 46-2 at 9-10, 26-28. Judge Karem entered an IPO, an order to remain in effect for three years. DN 46-2 at 26-28. Dahl appealed the issuance of the IPO. DN 46-2 at 23. The decision was upheld on appeal on December 28, 2017. DN 46-2 at 9-11.

At some point after the incident, Kilgore spoke in-person with management at The Grove at Lyndon regarding Dahl's presence at the complex during the early morning hours on February 13, 2017. DN 46-1 at 77. Fillmore was not present with Kilgore, nor did she speak to anyone at the apartment complex office about these events. DN 44-2 at 26, 29. On February 17, 2017, the apartment complex management issued a letter to Dahl notifying him that he was not permitted to be on the property, or he would be arrested for criminal trespass. DN 44-4.

Kilgore's version of events is documented in an incident report prepared by the Kentucky State Police when he called the incident in. DN 46-2 at 30. The report stated that he "had located [Dahl] walking behind buildings in the area of Sundance Drive. Request the information be CADED for future reference." DN 46-2 at 30. Two weeks later, Kilgore added to the report that "through investigation it was learned that [Dahl] was stalking his ex-girlfriend and he was advised not to be back on the property that night. Information was given to [Fillmore] on the 13th on how to obtain an EPO or IPO. The property manager also stated that she did not want [Dahl]

back on the property so she would serve [Dahl] with a trespass warning."[3] DN 46-2 at 30.
Neither officer filed a JC3 form, which, according to KRS 209A.120, is used to "document any
information or injuries related to domestic violence and abuse or dating violence and abuse." DN
46-1 at 66-67.

## II. <u>LEGAL STANDARD</u>

A party moving for summary judgment must demonstrate "there is no genuine dispute as
to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.
56(a). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an
otherwise properly supported motion for summary judgment; the requirement is that there be no
genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 263 (1986). An
issue of material fact is genuine if a rational fact finder could find in favor of either party on the
issue. *Id.* at 248.

In undertaking this analysis, the Court must view the evidence in a light most favorable to
the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The party moving for summary
judgment bears the burden of establishing the nonexistence of any issue of material fact. *Celotex
Corp. v. Catrett*, 477 U.S. 317, 330 (1986). A party can meet this burden by "citing to particular
parts of materials in the record" or "showing that the materials cited do not establish the . . .
presence of a genuine dispute." Fed. R. Civ. P. 56 (c)(1). This burden can also be met by
demonstrating that the nonmoving party "fail[ed] to make a showing sufficient to establish the
existence of an element essential to that party's case, and on which that party will bear the burden
of proof at trial." *Celotex*, 477 U.S. at 322.

## III. <u>DISCUSSION</u>

---

[3] Kilgore also filed a memorandum with Lieutenant Crockett with the KSP in which he detailed his interactions with
Dahl in response to a complaint field by Dahl with the KSP against Kilgore. DN 46-1 at 21.

In the Complaint, Dahl brings four claims. DN 1-2 at 8-9. First, he claims that Kilgore and Lietz violated his Fourth Amendment right to be free from unreasonable searches and seizures by performing a warrantless search of his cell phone. DN 1-2 at 8-9. Second, he claims he was defamed, arguing that (1) Kilgore used defamatory language about him that resulted in the issuance of a letter from the property manager at The Grove at Lyndon warning that he would be arrested for trespassing if he ventured onto the property and (2) Fillmore and Kilgore defamed him by making false statements to obtain an IPO. DN 1-2 at 8. Third, Dahl argues that Kilgore assaulted and battered him when Kilgore took his phone and prevented him from retrieving it. DN 1-2 at 9. Dahl also alleges that Lietz participated in the alleged assault and battery by failing to intervene in the phone incident. DN 1-2 at 9. Fourth, Dahl claims that the acts of Kilgore, Lietz, and Fillmore were intended to subject him to "cruel and unjust hardship," justifying punitive damages. DN 1-2 at 9.

### A.  Federal Civil Rights Claim Pursuant to 42 U.S.C. § 1983

To state a claim under Section 1983, "a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Burley v. Gagacki*, 729 F.3d 610, 619 (6th Cir. 2013) (quoting *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006). Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). A person who, under color of law, deprives another of their constitutional rights may be subject to liability. 42 U.S.C.

§ 1983. Dahl asserts that Kilgore and Lietz, acting under color of state law, violated his Fourth Amendment rights under the United States Constitution.[4] DN 1-2 at 4-5.

### 1. Fourth Amendment Protection Against Unreasonable Searches and Seizures

Kilgore and Lietz assert that they are entitled to qualified immunity with respect to the Fourth Amendment claim. DN 46 at 15-19, 43-1 at 4-5. It has long been established that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity balances "two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

When a defendant asserts qualified immunity, the plaintiff must show: (1) that the defendant's actions violated his or her constitutional or statutory rights and (2) the right violated was clearly established at the time of the alleged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2014). The Court is permitted to address these questions in any order, but we will consider whether there was a violation first, as "it often may be difficult to decide whether a right is clearly established without deciding precisely what the existing constitutional right happens to be." *Pearson*, 555 U.S. at 236 (quoting *Lyons v. Xenia* 417 F.3d 565, 581 (6th Cir. 2005) (Sutton, J., concurring)).

### a. Fourth Amendment Right to be Free from an Unreasonable Search

---

[4] In the Complaint, Dahl also alleges a violation of Section 10 of the Kentucky Constitution. As that aspect of Count II of the Complaint is not addressed by any party, it will not be addressed in this Opinion.

The Court must consider whether there is evidence that a constitutional violation occurred. The Fourth Amendment protects against unreasonable searches and seizures of an individual's person, residence, papers, and effects. U.S. Const. amend. IV.

Dahl contends that a Fourth Amendment violation occurred when Kilgore searched his cell phone. DN 1-2 at 8. A warrant is generally required before a cell phone may be searched, even when the device is seized incident to arrest, because "a cell phone would typically expose to the Government far more than the most exhaustive search of a house." *Riley v. California*, 573 U.S. 373, 396 (2014). Searches conducted "outside the judicial process, without prior approval by [a] judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Taylor v. City of Saginaw*, 922 F.3d 328, 334 (6th Cir. 2019) (quoting *United States v. Hockenberry*, 730 F.3d 645, 658 (6th Cir. 2013).

Here, Kilgore obtained access to Dahl's phone without a warrant. Even if Kilgore initially obtained possession of Dahl's cell phone with Dahl's consent, a point which is contested, the record establishes that Dahl never gave consent for Kilgore to look for Fillmore's phone number or call her and that Kilgore maintained possession of the phone for several minutes thereafter. DN 43-2 at 7, 46-1 at 26-27, DN 46-3 at 26-27. Thus, a search of Dahl's cell phone without consent, if proved, would be unconstitutional unless Kilgore establishes that an exception permitted the warrantless search under the circumstances.

In *Riley*, the United States Supreme Court held that a warrantless cell phone search is justified when the "exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *Id.* at 402 (quoting *Kentucky v. King*, 563 U.S. 452, 460 (2011)). These exigencies "could include the need

to prevent the imminent destruction of evidence in individual cases, to pursue a fleeing suspect, and to assist persons who are seriously injured or are threatened with imminent injury." *Id.* "The critical point is that . . . the exigent circumstances exception requires a court to examine whether an emergency justified a warrantless search in each particular case." *Id.*

Kilgore contends that he was faced with the exigent need to ensure Fillmore and her daughter were safe. DN at 46 at 90. The so called "emergency aid exception" requires a showing of an objectively reasonable basis for believing that a person needs immediate aid. *Michigan v. Fischer*, 558 U.S. 45, 47 (2009). The exception "does not depend on an officer's subjective intent or the seriousness of any crime they are investigating when the emergency arises." *Id.* (quoting *Brigham City, Utah v. Stuart,* 547 U.S. 398, 403 (2006)).

There are few cases involving the application of the emergency aid exception to cell phone searches. What is clear is that the modern invention of the cell phone and its use as a repository for personal information has been found to be as sacrosanct as the privacy of a home. *See Riley*, 573 U.S. at 396-397. *Riley* and *Fischer* teach that sufficient known facts must exist that give rise to an apparent immediacy of the need for intervention for an officer to be justified in dispensing with the requirement of obtaining a warrant before searching a cell phone.

The Court in *Riley* stated that the exigent circumstances exception did not justify an officer's decision to search through an individual's photographs, videos, or call log subsequent to arrest. *Riley*, 573 U.S. at 401. The Court noted, however, that an officer could conduct a warrantless search of a cell phone under certain particularly compelling circumstances such as where an officer had knowledge that a suspect texting an accomplice who might detonate a

bomb, or where an officer apprehending a suspected child abductor might have information about a missing child's location on his cell phone. *Id*. at 402. [5]

In *Michigan v. Fischer*, officers responded to a complaint of a domestic disturbance. The officers found a smashed pickup truck in the driveway of the house, damaged fenceposts, several broken windows, blood on the pickup truck, blood on clothes inside the truck, and blood on the door to the house. *Fischer*, 558 U.S. at 45-46. Officers then knocked on the door and asked whether Fischer needed any medical attention. *Id.* Fischer did not answer the questions and insisted that officers obtain a warrant. *Id.* An officer then pushed the front door open, entered the house, and was met by a long gun Fischer pointed at him. *Id.* When Fischer challenged the search, the United States Supreme Court held that even though a warrantless search had occurred, the emergency aid exception justified the officer's warrantless entry into the residence, despite the absence of "ironclad proof of a likely serious life-threatening injury." *Id.* at 49. The Court found a reasonable basis for the belief that Fischer needed immediate aid because "officers [] were responding to a report of a disturbance," "when they arrived on the scene they encountered a tumultuous situation in the house," and "the officers could see violent behavior inside." *Id.* at 48.

The facts presented in the case at bar are not comparable to the exigent circumstances found to justify a warrantless search in *Riley* or *Fischer*. Taking the facts in the light most favorable to Dahl, at the time of the encounter, Dahl was walking through the parking lot in the direction of his vehicle. DN 43-2 at 3. Dahl informed Kilgore that he did not live at the complex

---

[5] The Sixth Circuit's recent opinion in *United States v. Fletcher*, No. 19-3153, 2020 WL 6268635 (6th Cir. Oct. 26, 2020)), reaffirmed *Riley* by holding that, without a warrant, an officer must have an objectively reasonable basis before searching a cell phone. *Id.* at *5 ("At the time the officer told Fletcher he was going to search Fletcher's phones, there were no exigent circumstances or other reasonable grounds to support a finding that Fletcher was violating his legal obligations" even though Fletcher had two cell phones, a prior conviction for importuning a minor, and appeared nervous).

but explained that he had "walked behind the building to see if [Fillmore's] lights were on" and since they were off "[he] was leaving." DN 43-2 at 4. Dahl also informed Kilgore that he did not text or call Fillmore because he "didn't want to wake her up" and was only at the apartment complex to "discuss some stuff that [he had] on [his] mind that [he] didn't like about what was going on in [their] relationship." DN 43-2 at 4, 6. Dahl contends that even after these explanations, Kilgore grabbed his phone so that he could "do whatever [he needed] to do to make sure [Fillmore was] safe." DN 43-2 at 7.

On summary judgment we take the facts in the light most favorable to the non-moving party. However, even if Kilgore's version of events is believed, he does not identify any facts that he knew at the time that are sufficiently alarming to justify his warrantless search of Dahl's cell phone. His contention that he wanted to "make sure [Fillmore and] her daughter were okay," is simply conclusory and adds nothing to the quest for an objectively reasonable basis for believing that Fillmore was in immediate danger and in need of aid. DN 46-1 at 45. Kilgore claims that he was suspicious because Dahl (1) parked in a different location that he typically parks, (2) was not in his van when Kilgore drove by, (3) walked behind the apartment complex late at night in dark clothes, and (4) provided inconsistent explanations for his presence at the apartment complex. DN 46-1 at 14-18, 47-48, 91. Based on Kilgore's observation of Dahl's presence, he legitimately stopped Dahl, searched his person, and inquired about why Dahl was at the apartment complex. Although the encounter yielded nothing alarming, Kilgore obtained possession and searched Dahl's cell phone for Fillmore's phone number, placed a call to her, and maintained possession of the phone for a period of time thereafter. Kilgore attempts to bolster his argument about his concern for Fillmore's well-being by arguing that certain text messages he saw evidenced an "argument" between Dahl and Fillmore. DN 46-1 at 28. The text messages of

record do not contain any "argument," but rather are very brief and non-argumentative. To the extent there were other texts reviewed by Kilgore, they are not in the record.

Unlike the facts presented in *Fischer*, Kilgore was not called to the scene to address a disturbance. While Kilgore observed Dahl's van and movements at the apartment complex on February 12 and 13, 2017, he did not testify that he heard any loud noises, rowdy behavior, or violent conduct. The facts known to Kilgore, even as he recited them, do not establish the exigency required by *Riley* to justify the search of a cell phone without a warrant. Although Dahl's behavior was undoubtedly suspicious, and justified the stop and inquiry, this encounter was brief and initially non-confrontational and involved no one other than Dahl. It is simply not comparable to the urgent circumstances described in *Fischer* or *Riley* and thus required a warrant if Kilgore was intent on proceeding further.

Kilgore also asserts that the community caretaker exception justifies his conduct. DN 46 at 16-18. This exception applies when government actors perform "community-caretaker functions rather than traditional law-enforcement functions." *Taylor*, 922 F.3d at 335 (quoting *Ziegler v. Aukerman*, 512 F.3d 777, 785 (6th Cir. 2008). This exception requires the court to "look at the *function* performed by a Government agent when a search occurs." *Id.* (quoting *Hunsberger v. Wood*, 570 F.3d 546, 554 (4th Cir. 2009) (emphasis in original). The function must be "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). Moreover, "the community caretaker exception does not provide the Government with refuge from the warrant requirement except when delay is reasonably likely to result in injury or ongoing harm to the community at large." *United States v. Washington*, 573 F.3d 279, 289 (6th Cir. 2009).

Courts have applied the community caretaker exception to situations in which public safety is jeopardized. *See e.g., South Dakota v. Opperman*, 428 U.S. 364, 369 (1976) (applying the community caretaker exception to a warrantless search of a vehicle after it was impounded for violating parking ordinances, which jeopardized the public safety and the efficient movement of vehicular traffic); *United States v. Rohrig,* 98 F.3d 1506, 1522 (6th Cir. 1996) (applying the community caretaker exception to an officer's warrantless entry of a home to dispel loud noise that prevented neighbors from sleeping because strict adherence to the warrant requirement would subject the community to an immediate, continuing and highly objectionable disturbance for an extended period of time). Courts have declined to apply the community caretaking exception when the community interest sought to be protected was found insufficient to outweigh a significant privacy interest. *See e.g., United States v. Washington*, 573 F.3d. 279, 288-89 (2009) (declining to apply the community caretaker exception or the exigent circumstances exception broadly to the investigation of criminal trespass and drug trafficking inside an apartment noting that "when people may have the capacity to harm others, but are not engaged in an inherently dangerous activity, officers cannot lawfully dispense with the warrant requirement"); *United States v. Williams*, 354 F.3d 497, 504 (2003) (declining to extend the community caretaker exception when officers entered a rental property despite significant suspicion of criminal activity and the possibility of a water leak because they were "neither faced with any true immediacy, nor confronted by any real danger that serious consequences would certainly occur to the police, [property,] or others if [they] did not enter the residence").

At the outset, Kilgore fails to demonstrate how his conduct was "divorced from a detection, investigation, or acquisition of evidence" as he was discerning Dahl's motives for being on the apartment complex grounds. Although no arrest was made during the encounter,

14

Kilgore testified that the actions he took were "to investigate further" to "make sure [Fillmore and] her daughter were okay" because "Dahl acted [] suspicious in an uncommon area," "text messages [that] basically [said] leave [her] alone," and he was "unaware of [Dahl's] intentions or what [Dahl] was capable of." DN 46-1 at 26, 44-48. Further, Kilgore fails to articulate any potential harm to the community at large. The evidence of record establishes that, at the time of the encounter, Dahl was returning to his van after purportedly deciding to leave. DN 43-2 at 3. Kilgore has not even attempted to articulate how a search of Dahl's phone would have averted harm to the community at large. While "[a]n ongoing nuisance that results in non-physical harm to others may constitute an exigency . . . the mere possibility of physical harm does not." *United States v. Washington*, 573 F.3d 279, 288 (2009).

Accordingly, we find a potential violation of Dahl's Fourth Amendment right occurred, which has not been shown to be otherwise justified under the law.

Dahl also alleges a Fourth Amendment violation against Lietz asserting that Lietz illegally searched him.[6] A search occurs when a state actor invades one's reasonable expectation of privacy. *Katz v. United States*, 389 U.S. 347, 360-61 (1967) (Harlan, J., concurring). Viewing the facts in the light most favorable to Dahl, there is no evidence that Lietz conducted or participated in a search of Dahl's cell phone. Lietz testified that he "didn't see what Trooper Kilgore did when [Kilgore] was holding the phone." DN 46-3 at 26. Lietz also testified that he "didn't see the screen of the phone or anything." DN 46-3 at 27. In contrast to the facts concerning Kilgore's conduct, Dahl has not shown that Lietz engaged in any search. In fact,

---

[6] Dahl alleges in the Complaint that Lietz and Kilgore acted "in concert." The only fact that would suggest that Lietz and Kilgore acted in concert with one another relates to Kilgore's request that Lietz run Dahl's driver's license through NCIC. That action has no bearing on any search of Dahl's cell phone, the only remaining claim grounded in an alleged unconstitutional search. The illegal detention claim was dismissed in our previous opinion. DN 12.

nowhere in the sworn interview of Dahl with LMPD did Dahl claim that Lietz touched, used, or possessed his cell phone.[7]

Accordingly, Dahl has failed to establish that Lietz's conduct violated a constitutional right and Lietz is entitled to summary judgment.

### b. Clearly established violation.

Second, this Court must consider whether the search of Dahl's cell phone involved a clearly established constitutional right of which a reasonable officer would have known. The "clearly established" determination hinges on the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Pearson*, 555 U.S. at 244. As such, the relevant question becomes whether a reasonable officer would have known that a warrantless search of the cell phone was unlawful, under the circumstances of this case, and considering clearly established law and the information possessed by the officer on the scene.

A state actor "conducting a search is entitled to qualified immunity where clearly established law does not show that the search violated the Fourth Amendment." *Pearson*, 555 U.S.at 243. This does not mean that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Thus, Kilgore is entitled to qualified immunity if it would be objectively reasonable for an officer in the same or similar circumstances to conclude that a warrantless search of Dahl's cell phone was reasonable due to exigency to render emergency aid to Fillmore or to protect the community from imminent harm.

---

[7]The interview was conducted by LMPD's internal affairs office in investigating Dahl's allegations of wrongdoing by Lietz. DN 43-2.

It was not objectively reasonable for Kilgore to conclude that the search of Dahl's cell phone was permissible on the basis that Fillmore was in danger or that Dahl posed some larger threat to the community on the scant information he possessed and the circumstances of the encounter with Dahl. The right to be free from a warrantless search of one's a cell phone is clearly established by the Fourth Amendment and case law. *Riley* 573 U.S. 373, 401 ("our holding . . . is not that the information on a cell phone is immune from search; it is instead that a warrant is generally required before such a search. . . ."). In fact, the Court in *Riley* was unwilling to permit officers to search an arrestee's cell phone without a warrant unless a reasonable officer would have objectively believed that it was necessary to render immediate aid or protect public safety. *See id.* at 401-02. Clearly, the facts presented in *Riley* and other cases where courts have found that exigent circumstances justified a search are not comparable to the facts presented in the case at bar. Although it is undisputed that Kilgore observed Dahl behind an apartment building late at night uninvited, it was not evident that this conduct, even considered together with the text messages viewed on Dahl's phone and Kilgore's version of events, objectively justified the warrantless search of Dahl's cell phone. Though the late-night activity arguably justified a stop, Kilgore has not offered evidence known to him that would support an objectively reasonable belief that Dahl posed a threat to Fillmore or to public safety.

Kilgore also contends that KRS 456.090(2) justified the search of Dahl's cell phone. The statue provides that:

> When a law enforcement officer has reason to suspect that a person has been the victim of dating violence and abuse, sexual assault, or stalking, the officer shall use all reasonable means to provide assistance to the victim, including but not limited to: (a) Remaining at the location of the call for assistance so long as the officer reasonably suspects there is danger to the physical safety of individuals there without the presence of a law enforcement officer; (b) Assisting the victim in obtaining medical treatment,

17

> including transporting the victim to the nearest medical facility capable of providing the necessary treatment; and (c) Advising the victim immediately of the rights available to them, including the provisions of this chapter.

KRS 456.090(2). It is not clear that a reasonable officer would have had reason to suspect that Fillmore was the victim of dating violence or stalking. The record does not evidence that Kilgore was presented with any facts at the time of the encounter that satisfied the statutory definition of "dating violence and abuse," which includes "stalking." KRS 456.010(2). Stalking requires two or more acts that seriously alarms, annoys, intimidates, or harasses a person. KRS 508.130 (2). Despite Kilgore's testimony that, in his opinion, Dahl satisfied the statutory definition of stalking, there is no evidence that Dahl engaged in two acts at the time of the encounter. DN 46-1 at 58-59.

Even if Kilgore had a reason to suspect that Fillmore or someone else at the apartment complex was the victim of dating violence or stalking, the statute required him to use reasonable means in aiding a suspected victim. Although Kilgore contends that his search and use of the phone was done to "make sure [Fillmore] was safe" rather than to find evidence of a crime, *Riley* is clear that a warrantless search of a cell phone absent exigent circumstances is a violation of an individual's Fourth Amendment rights. *Riley*, 573 U.S. at 402. As discussed above, there were no exigent circumstances presented to Kilgore. The facts presented at the time of the encounter did not justify anything beyond a mere stop because Kilgore did not have an objectively reasonable basis for believing that Fillmore needed immediate aid.

We conclude that, if proven, Kilgore's conduct would violate clearly established law of which a reasonable officer would have been aware that prohibited a warrantless search of Dahl's cell phone. Thus, Kilgore is not entitled to qualified immunity on this claim alleging a Fourth Amendment violation.

18

### B. Defamation

Dahl asserts defamation claims against Kilgore and Fillmore. DN 1-2 at 8. Defamation is defined as "making[ing] a false statement about someone to a third person in such a way as to harm the reputation of the person spoken of." *Toler v. Sud-Chemie, Inc.*, 458 S.W.3d 276, 282 (Ky. 2014). Proving defamation in Kentucky requires: "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Id*. If a statement is written, the defamation is libel; however, if the statement is oral, the defamation is slander. *Id*. at 281, n. 7.

Generally, defamatory words are divided into two classes in determining the extent to which they are actionable—per se or per quod. *Hill v. Evans*, 258 S.W.2d 917, 918 (Ky. 1953). If words are defamatory per se, "damages are presumed[,] and the plaintiff may recover without alleging or proving special damages." *Id*. Statements that are categorized as defamatory per se include those which impute the commission of a crime involving moral turpitude, affliction with a loathsome disease, serious sexual misconduct, or conduct which is incompatible with his business, trade, profession, or office. *Gilliam v. Pikeville United Methodist Hosp. of Kentucky, Inc.*, 215 S.W.3d 56, 61 (Ky. Ct. App. 2006). On the other hand, words are actionable per quod only if the plaintiff suffers special damages as a result (i.e., actual injury to reputation). *Toler*, 458 S.W.3d at 282. "Special damages are those beyond mere embarrassment which support actual economic loss." *Columbia Sussex Corp. v. Hay*, 627 S.W.2d 270, 274 (Ky. App. 1981).

### 1. Alleged Defamatory Statements to the Management at The Grove at Lyndon

Dahl contends that Kilgore and Fillmore made slanderous statements during a conversation with management at The Grove at Lyndon. DN 1-2 at 6-7. That is, Dahl alleges that the Defendants told the apartment's management that he was a "stalker." DN 1-2 at 6-7. Kilgore admits describing the events that transpired during the early-morning hours of February 13, 2017 to the apartment complex's management but does not recall stating that Dahl was stalking Fillmore. DN 46-1 at 78-81. Fillmore states that she was not present when Kilgore spoke with the apartment complex's management, and she herself never spoke with management about the incident. DN 44-2 at 29.

Dahl has not come forward with evidence supporting the allegation that defamatory statements were made to the apartment's management. He has offered no such evidence from the apartment complex employees or otherwise. Instead, Dahl suggests that the Court draw an unsubstantiated inference that since Dahl received a letter from The Grove at Lyndon stating he was barred from the premises, Kilgore and Fillmore, alone or jointly, must have told the management he was a "stalker." DN 1-2 at 6-7.

Federal Rule of Civil Procedure Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Dahl cannot rely solely on conjecture in responding to Defendants' motions; instead, he "must adduce some concrete evidence on which a reasonable juror could return a verdict in his favor." *Frank v. D'Ambrosio*, 4 F.3d 1378, 1384 (6th Cir. 1993). A genuine issue of material fact is not made out by Dahl's mere suggestion that a slanderous statement (i.e., he is a "stalker") could have been made. *Celotex Corp.*, 477 U.S. at 323 (there is "no genuine issue of material fact

because the nonmoving party failed to make a sufficient showing on an essential element of her

case with respect to which she has the burden of proof"). Thus, Dahl "must do more than simply

show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

To be clear, Kilgore does not deny that he informed the complex's management of the

encounter. It is also clear that the management did not want uninvited non-resident individuals

on the property, and that they took steps to prevent Dahl's return by putting him on notice that

they did not want him to return. DN 44-4. Conspicuously absent is any evidence from the

apartment management other than the letter. Dahl does not explain how the letter evidences that

anything beyond the undisputed facts concerning his presence were communicated to the

management—Dahl was present at the complex late at night to see if Fillmore's lights were on,

he did not live there, he was there uninvited, and his conduct was suspicious to Kilgore. Instead,

he merely takes issue with the supposed characterization of his behavior during the early

morning hours of February 13 as "stalking. Without some showing by Dahl that a genuine issue

of material fact exists concerning the statement made to the apartment complex's management,

judgment must be rendered in Defendants' favor as a matter of law.

Accordingly, Kilgore and Fillmore motions regarding alleged defamatory statements

made to the apartment's management will be granted.

### 2.   Kilgore's Alleged Libelous Statements Contained in the CAD Incident Report

Dahl also contends that Kilgore made libelous statements within the Computer Aided

Dispatch ("CAD") Incident Report he filed with the Kentucky State Police. DN 1-2 at 6. Kilgore

denies making any false statements within his report. DN 46 at 10. He admits to using the word

"stalking" in the amended version of the report. DN 46-1 at 49. He contends that his use of the

word "stalking" was not defamatory because it was true. DN 46 at 10. He also contends that the

*Rooker-Feldman* doctrine and collateral estoppel defeat Dahl's claim. DN 46 at 12-15.

The Commonwealth of Kentucky recognizes truth as an absolute defense to a claim for

defamation. *Stringer v. Wal-Mart Stores, Inc.,* 151 S.W.3d 781, 796 (Ky. 2004), overruled on

other grounds by *Toler v. Sud-Chemie, Inc.*, 458 S.W.3d 276 (Ky. 2014). In fact, "truth is a

complete defense for libel, even if the statements are libelous per se." *Bell v. Courier-Journal

and Louisville Times Company, Ky.*, 402 S.W.2d 84, 87 (1966). When asserted, the defendant

bears the burden of proving by a preponderance of the evidence that any allegedly defamatory

statement made was true. *Stinger,* 151 S.W.3d at 796 (quoting David A. Elder, Kentucky Tort

Law: Defamation and the Right of Privacy, § 1.07(A) at 40 (1983)).

Here, Kilgore offered evidence that his use of the word "stalking" was true. Courts

measure whether a statement was defamatory based on its most natural meaning. *See Stringer*,

151 S.W.3d at 793 (defamatory statements should be measured by the "natural and probable

effects on the mind of the average reader"). During the fifteen days that elapsed between the time

of Kilgore's initial report and his amendments to the report that included the word "stalking,"

Kilgore had spoken with Fillmore who informed him that Dahl had sent her texts after the

incident that were "hateful" and included "a gun emoji." DN 46-1 at 58-59. Fillmore also told

Kilgore that "she was trying to get [Dahl] to leave her alone." 46-1 at 100. Additionally, Kilgore

learned that Fillmore and Dahl had an argument during which she threatened to call the police,

but Dahl took her phone away. DN 46-1 at 69-70. Based on all the information Kilgore obtained

after the incident with Dahl, he added in the CAD Incident Report that "through investigation it

was learned that [Dahl] was stalking [Fillmore]. . . ." DN 46-2 at 30.

Stalking requires an individual to (1) engage in an intentional course of conduct directed at a specific person which seriously alarms, annoys, intimidates, or harasses the person, and which serves no legitimate conduct and (2) a course of conduct that causes a reasonable person to suffer substantial mental distress. KRS 508.130 (1). Course of conduct is defined as "a pattern of conduct composed of two or more acts, evidencing a continuity of purpose." KRS 508.130 (2). In Kilgore's deposition, he testified that the statutory requirements were satisfied because of his encounter with Dahl and Dahl's subsequent contact with Fillmore, which included "numerous texts coming through . . . with the gun Emojis [] in hateful texts that he sent in reference to this case." DN 46-1 at 58-59. Dahl has not come forward with any evidence to refute Kilgore's assertion that the statement that Dahl was "stalking" Fillmore was true. He does not challenge the facts as reportedly gleaned from Fillmore that formed the basis of Kilgore's determination that Dahl was "stalking" Fillmore.

In addition to the information learned from Fillmore, Kilgore submitted state court records with his motion for summary judgment to demonstrate that his use of the word "stalking" was true. The records evidence that Fillmore herself initially used the word "stalking" in the factual statement section of the Petition/Motion for Order of Protection she filed with the Jefferson County District Court on February 18, 2017. DN 46-2 at 46-48. She used the term "stalking" to describe Dahl's conduct on February 13, 2017 and the days thereafter and asked the court to prevent Dahl from communicating with her via text, calls, or social media. DN 46-2 at 46-48. The Court granted her an Order to prevent Dahl from committing "further acts of abuse or threats of abuse, stalking, or sexual assaults." DN 46-2 at 44-45. Further, one of the exhibits attached to the IPO issued on March 2, 2017, show a series of text messages dated February 17 and 18, 2017, in which Fillmore asked that Dahl stop communicating with her, coming to her

house, and visiting her at work. DN 46-2 at 32-41. The records also include an Order from the

Jefferson County Circuit Court upholding a three-year IPO, finding that the "totality of [Dahl's]

conduct, including the sending of racist and belligerent and aggressive text messages . . .

supported a finding of dating violence that placed [Fillmore] in fear of imminent danger that

violence was likely to occur." DN 46-2 at 9-11. In fact, "dating violence" includes the term

"stalking."

      Dahl also does not refute any of the evidence concerning the petition for IPO or the other

orders of the courts. Dahl merely takes issue with the characterization of his behavior on

February 13 and the days thereafter as "stalking." As Dahl has not provided evidence to

controvert the facts put forth by Kilgore, nor has he offered any legal argument in opposition to

Kilgore's assertion of truth as a defense to Dahl's characterization of his conduct as defamatory,

Kilgore's motion for summary judgment regarding the use of defamatory language within the

incident report will be granted.

### 3. Fillmore's Alleged Defamatory Statements Related to the EPO and DVO

      Similarly, Dahl claims that Fillmore made false and defamatory statements in a Jefferson

County District Court proceeding to obtain an IPO. DN 1-2 at 7. While Fillmore does not deny

using the word "stalking" in her Petition/Motion for Order of Protection and during court

proceedings, she contends that the Court should dismiss the claim against her as a matter of law

because Dahl has not shown any special damages, and alternatively, she immune from liability

because she is entitled to an absolute privilege. DN 44 at 5, 9-10. Additionally, she contends that

the statements are true and therefore not actionable as defamation. DN 44 at 7-9.

      In his Complaint, Dahl sought damages generally for "great embarrassment, loss of

reputation in the community, and unnecessary and costly involvement in the judicial system" that

caused him to "suffer severe distress, depression, anxiety, financial stress and loss of friendships." DN 1-2 at 8. Dahl also alleges that he was required to attend 28 Domestic Violence courses at a cost of $500 as a result of Fillmore's purported defamatory statements. DN 1-2 at 8.

Dahl was required to attend court ordered anger management counseling (the $500 worth of Domestic Violence Courses to which he refers) at the behest of Judge Karem, who ordered that he attend counseling after hearing the evidence and determining an IPO was warranted. DN 46-2 at 25. The Jefferson County Circuit Court opinion affirms that the IPO was issued after Judge Karem examined "the totality of [Dahl's] conduct, including the sending of racist and belligerent and aggressive text messages," which "supported a finding of dating violence and placed Fillmore in fear of imminent danger that violence was likely to occur." DN 46-2 at 10. In fact, Dahl does not deny that he was at The Grove at Lyndon late at night, that he walked behind the maintenance shop near a row of trees in the back of the complex to look up at Fillmore's apartment window to see if her lights were on, or that Fillmore asked him to leave her alone in subsequent text conversations. Instead, he takes issue with the characterization of these actions as "stalking." Clearly, here "stalking" is in the eye of the beholder. Thus, the Court's decision to require Dahl to attend court ordered counseling was based on Dahl's actions between February 13-18, the use of a word "stalking" notwithstanding DN 46-2 at 9-11.

Assuming, arguendo, that the $500 cost associated with the court-ordered counseling could constitute special damages, Fillmore's statements made to obtain an IPO are absolutely privileged. The judicial statements privilege provides that "statements in judicial proceedings are absolutely privileged when material, pertinent, and relevant to the subject under inquiry, though it is claimed that they are false and alleged with malice." *Maggard v. Kinney*, 576 S.W.3d 559,

567 (Ky. 2019) Importantly, this privilege "encompasses written statements in pleadings as well as the statements of witnesses in judicial proceedings." *Id*.

Accordingly, Fillmore's motion from summary judgment with respect to her use of the term "stalking" in her Petition/Motion for Order of Protection will be granted.

### C. Assault and Battery

Dahl asserts that Kilgore committed an assault and battery against him and that Defendant Lietz failed to intervene in the alleged altercation. DN 1-2 at 9. "Assault is a tort which merely requires the threat of unwanted touching of the victim, while battery requires an actual unwanted touching." *Banks v. Fritsch*, 39 S.W.3d 474, 480 (Ky. App. 2001). "[A]n actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other . . . and (b) a harmful contact with the person of the other directly or indirectly results." *Vitale v. Henchey*, 24 S.W.3d 651, 657 (Ky. 2000) (quoting Restatement (Second) of Torts § 13 (1965)). The defendant must intend to "make contact with the person" but need not intend to cause harm. *Id*. at 657–58. A battery can occur without an assault if, for example, there is no threat perceived by the victim. Similarly, an assault can occur without a battery where there is a threat of physical contact, which ultimately does not occur. Thus, this Court must analyze each claim.

### 1. Kilgore's Alleged Assault

Dahl claims that Kilgore rushed toward him and grabbed his phone. DN 1-2 at 5. Kilgore testified that Dahl voluntarily handed over his phone. DN 46-1 at 26. An official report of a sworn interview of Dahl conducted by LMPD's internal affairs office contains the following statement by Dahl[8]:

---

[8] The interview of Dahl was conducted in the course of investigating wrongdoing by Lietz. Lietz has put this LMPD document in the record.

> I took out my phone at that point and said, Matter [sic] of fact, I think it's time for me to get a hold of my attorney. And I had my phone in my right hand with just two fingers. And I was scrolling through with my left. And, um, at that point, I feel my phone being tugged. And I look up. And he's pulling my phone. So I pull back. And he basically lunges towards me with his other arm and pushes my phone back into my thumb, which jams my thumb back. And, urn [sic], I raised my arms up and let go of the phone. And he takes my phone.

DN 43-2 at 7.

Regardless of how Kilgore obtained possession of Dahl's cell phone, that is whether it was grabbed or voluntarily handed over, there is no evidence of a threat to Dahl or that Dahl was aware of a threat before Kilgore allegedly contacted him. In fact, Dahl stated that he did not "look up" until Kilgore began pulling his phone. DN 43-2 at 7.

Accordingly, Kilgore's motion for summary judgment on the claim for assault will be granted.

### 2. Kilgore's Alleged Battery

Dahl claims a battery occurred when Kilgore took his cell phone from his grasp. DN 1-2 at 9. Kilgore denies that he obtained Dahl's phone against Dahl's will. DN 46-1 at 26. Rather, he testified that Dahl relinquished his phone voluntarily to show him text messages, which Dahl offered to support his explanation for his presence at the apartment complex. DN 46-1 at 25-26. Dahl's interview with LMPD indicates that a struggle occurred between Dahl and Kilgore. DN 43-2 at 7. A genuine issue of material fact exists as to the circumstances of Kilgore's physical contact with Dahl to obtain the cell phone. Thus, to the extent that Dahl's state law battery claim is based on Kilgore's alleged physical contact with Dahl to obtain the cell phone, Kilgore's motion for summary judgment will be denied.

Dahl also claims that Kilgore pushed him backward during the struggle. DN 1-2 at 5. Kilgore admits to "gently pushing" Dahl backward but claims that it occurred when Dahl became "agitated" because Kilgore had possession of the phone. DN 46-1 at 30, 88-89. Kilgore urges that the push was needed to "create space for [Dahl's] safety and [his own]" in case there was an "officer safety issue." 46-1 at 88-89. Thus, Kilgore admittedly intended to physically contact Dahl by pushing him backward and he admits that he did, in fact, have physical contact with Dahl.

Kilgore urges that he should be shielded from liability, despite the occurrence of an unwanted touching, based on qualified official immunity. DN 46 at 23. Law enforcement officers acting in their official capacity are entitled to qualified official immunity for the negligent performance of "(1) discretionary acts or functions, i.e., those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the scope of the [their] authority. *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). "Actions taken within the scope of one's authority as a police officer constitute discretionary acts." *Leath v. Webb*, 323 F. Supp. 3d 882, 902 (E.D. Ky. 2018). Bad faith is demonstrated from "objective unreasonableness" or when an officer "willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive." *Yanero*, 65 S.W.3d at 523. Once an officer shows "prima facie that the act was performed within the scope of his/her discretionary authority, the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith." *Id.* at 523.

Dahl has not offered any legal argument opposing qualified official immunity. In fact, Dahl does not claim in his sworn interview with LMPD that Kilgore pushed him backward at any point during the encounter. DN 43-2. Therefore, to the extent that Dahl's state law battery claim

28

is based on Kilgore's alleged push of Dahl to create space between the two, Kilgore's motion for summary judgment will be granted

### 3. Lietz's Failure to Intervene

Dahl also alleges that Lietz should be liable for failing to intervene in the alleged assault and battery and for "failing to report [Kilgore's behavior] to the proper authorities." DN 1-2 at 9. It is undisputed that Lietz was not on the scene in response to a call, but rather stopped as he was going through the complex as part of his usual beat. DN 46-3 at 8. Dahl has cited no authority that Lietz had a duty under the circumstances to intervene. In fact, Dahl did not respond to Lietz's motion. As there is a complete absence of evidence and argument in support of Dahl's claim, we will deem the claim abandoned and grant Lietz's motion for summary judgment on this issue.

### IV. <u>CONCLUSION</u>

In summary, we find that Lietz is entitled to summary judgment on all claims against him because Dahl has failed to establish that Lietz's conduct violated a constitutional right and Dahl failed to provide evidence or argument in support of his claim that Lietz's failed to intervene in an alleged assault or battery. Accordingly, Lietz's Motion for Summary Judgment will be granted by separate order for the reasons stated herein.

We also find that Fillmore is entitled to summary judgment on all claims against her since Dahl has not come forward with any evidence to refute Fillmore's contention that she did not speak with the apartment complex's management. Further, her use of the word "stalking" in a Petition/Motion for Order of Protection or court proceedings is absolutely privilege, and Dahl has not shown any special damages from her use of the word. Accordingly, Fillmore's Motion for Summary Judgment will be granted by separate order for the reasons stated herein.

Finally, we conclude that Kilgore is not entitled to summary judgment regarding Dahl's Fourth Amendment claim and the battery claim. However, Kilgore is entitled summary judgment on the assault claim asserted against him. Further, Kilgore is entitled to summary judgment on the defamation claims against him because Dahl has not provided this Court with any evidence to refute Kilgore's contention that he did not make a defamatory statement to the apartment's management and that his written statements within the CAD Incident Report were true based on information he learned from Fillmore and the state court records detailing the IPO proceedings. Accordingly, Kilgore's Motion for Summary Judgment will be granted in part and denied in part by separate order for the reasons stated herein.

November 12, 2020

Charles R. Simpson III, Senior Judge
United States District Court

30